UNITED STATES DISTRICT COURT
DISTRICT OF COLUMBIA

UNITED STATES OF AMERICA,

    - against -

AVTANDIL KALANDADZE

          Defendant.

26 Cr. 24 (BAH)

## SENTENCING MEMORANDUM ON BEHALF OF
## DEFENDANT AVTANDIL KALANDADZE

LANKLER SIFFERT & WOHL LLP

Jillian B. Berman
Michael D. Longyear

1185 Avenue of the Americas
New York, NY 10036
(212) 921-8399

*Attorneys for Defendant*
*Avtandil Kalandadze*

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................................ 1

PROCEDURAL HISTORY .................................................................................. 2

AVTO'S BACKGROUND .................................................................................. 3

I.      Avto's Upbringing and Career as a Distinguished Mariner ................................ 3

II.     Avto's Devotion to Three Generations of His Family ....................................... 5

III.    Avto's Life Has Been Characterized by Generosity, Selflessness, and Integrity .............. 8

OFFENSE CONDUCT ...................................................................................... 13

I.      After More Than a Year of Unemployment, Avto Accepted Employment on *Bella 1* .... 13

II.     Dissension Onboard *Bella 1* and Subsequent U.S. Coast Guard Interaction ................... 14

THE PROBATION OFFICE'S RECOMMENDATION RESTS UPON FACTUAL PREMISES
        UNSUPPORTED IN THE RECORD .............................................................. 15

RELEVANT SENTENCING CONSIDERATIONS ................................................... 17

I.      Applicable Legal Standard ................................................................... 17

II.     The Guidelines' Treatment of Zero-Point Offenders Strongly Supports Time Served .... 18

III.    Section 3553(a) Factors Support a Sentence of Time Served ................................ 19

        A.      Avto's Personal History and Characteristics Warrant Leniency .......................... 20

        B.      The Nature and Circumstances of the Offense Also Support a Sentence of Time
                Served ................................................................................. 20

        C.      A Sentence of Time Served Fully Satisfies the Purposes of Deterrence, Protection
                of the Public, and Just Punishment .................................................... 21

                1.      Deterrence Has Already Been Achieved and No Further Incarceration is
                        Necessary ..................................................................... 22

                2.      Seven Months of Harsh Pre-Sentence Detention Constitutes Substantial
                        Punishment .................................................................... 23

                3.      Avto Faces Significant Collateral Consequences Beyond this Court's Sentence. 25

        D.      The Need to Avoid Unwarranted Sentencing Disparities Supports a Sentence of
                Time Served ............................................................................ 27

IV.    The Court Should Not Impose Supervised Release or a Fine ........................................... 31

CONCLUSION .................................................................................................................................. 32

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Matter of Badalamenti*,
19 I. & N. Dec. 623 (BIA 1988) ..................................................................................26

*Gall v. United States*,
552 U.S. 38 (2007) .....................................................................................................18

*Pepper v. United States*,
562 U.S. 476 (2011) ....................................................................................................17

*Pronsivakulchai v. Gonzales*,
461 F.3d 903 (7th Cir. 2006) ......................................................................................26

*Rosales-Mireles v. United States*,
585 U.S. 129 (2018) ....................................................................................................17

*United States v. Booker*,
543 U.S. 220 (2005) ....................................................................................................17

*United States v. Carrasquillo-Flores*,
22 Cr. 305 (D.P.R.) (Delgado-Hernandez, J)...............................................................30

*United States v. Del-Rosario*,
23 Cr. 179 (D.P.R.) (Arias-Marxuach, J.)....................................................................29

*United States v. Frometa-Cabrera*,
24 Cr. 427 (D.P.R.) (Delgado-Colón, C.J.)..............................................................28, 29

*United States v. Jaime*,
235 F. Supp. 3d 262 (D.D.C. 2017) ............................................................................28

*United States v. Khatallah*,
41 F.4th 608 (D.C. Cir. 2022)......................................................................................18

*United States v. Lantigua-Vazquez*,
23 Cr. 4 (D.P.R.) (Carreno-Coll, J.).............................................................................30

*United States v. Montano Castro*,
16 Cr. 197 (M.D. Fla.) (Scriven, J.).............................................................................26

*United States v. Otunyo*,
18 Cr. 251 (D.D.C.) (Howell, J.) .................................................................................27

*United States v. Rijo-Cedano*,
   16 Cr. 481 (D.P.R.) (Delgado-Colón, C.J.)..........................................................2, 30

*United States v. Smith*,
   27 F.3d 649 (D.C. Cir. 1994) ..........................................................................27

*United States v. Stewart*,
   590 F.3d 93 (2d Cir. 2009)..............................................................................27

*United States v. Thomas*,
   999 F.3d 723 (D.C. Cir. 2021) .........................................................................27

*Zadvydas v. Davis*,
   533 U.S. 678 (2001)......................................................................................27

**Statutes**

8 U.S.C. § 1182(a)(9)(A) ....................................................................................26

8 U.S.C. § 1231(a)(6).........................................................................................27

18 U.S.C. § 2237(a)(1)......................................................................................3, 28

18 U.S.C. § 3553(a) ....................................................................... *passim*

18 U.S.C. § 3585(b)(1) ......................................................................................2

28 U.S.C. § 994...............................................................................................19

**U.S. Sentencing Guidelines, Policy Statements, and Commentary**

U.S.S.G. App'x C, amend. 821............................................................................19

U.S.S.G. App'x C, amend. 836............................................................................19

U.S.S.G. ch. 1, pt. A (2025)...............................................................................21

U.S.S.G. § 2A2.4 ..........................................................................................3, 19

U.S.S.G. § 2K2.1(b)(10) ...................................................................................21

U.S.S.G. § 3B1.3.............................................................................................3

U.S.S.G. § 3C1.1..........................................................................................3, 28

U.S.S.G. § 3C1.2..........................................................................................3, 28

U.S.S.G. § 3E1.1............................................................................................3

U.S.S.G. § 4C1.1.............................................................................................................3, 19

U.S.S.G. § 5C1.1 n.9.............................................................................................................19

U.S.S.G. § 5D1.1 ...................................................................................................................31

U.S.S.G. § 5K2.12 (2024).......................................................................................................21

**Other Authorities**

90 Fed. Reg. 59660 (Dec. 19, 2025) .....................................................................................21

Kendra McSweeney, Mat Coleman & Douglas A. Berman, *The Challenge of Just Federal Sentencing for Boat Defendants,* 37 Fed. Sent'g Rep. 103 (2025) ............................24

David Cowan, *U.S. Remove Tanker Captain from U.K. Waters as Crew Set to Leave Scotland*, BBC News (Jan. 27, 2026), https://www.bbc.com/news/articles/cgqep9pvygko .................................................................23

Polina Ivanova, *The Sailors Who Keep 'Ghost' Tankers Moving*, Financial Times (May 8, 2026), https://www.ft.com/content/e3f2767a-1da1-4669-ae8c-fe47b7a42896?syn-25a6b1a6=1 ...............................................................................................22

Press Release, U.S. Dep't of Just., *Master of Shadow Fleet Tanker Pleads Guilty in D.C. for Evading U.S. Coast Guard During Weeks-Long Pursuit* (June 12, 2026), https://www.justice.gov/usao-dc/pr/master-shadow-fleet-tanker-pleads-guilty-dc-evading-us-coast-guard-during-weeks-long ..............................................................22

Nat'l Immigr. Project, *ICE Stipulations to Removal Explainer* (June 2025), https://nipnlg.org/sites/default/files/2025-07/2025_NIPNLG-ICE-stipulations.pdf...............................................................................................................26

Nicholas Nehamas, Seamus Hughes & Christiaan Triebert, *U.S. Indicts Captain of Oil Tanker Seized After Coast Guard Pursuit*, N.Y. Times (Feb. 17, 2026), https://www.nytimes.com/2026/02/17/us/politics/us-coast-guard-oil-tanker-captain-venezuela..............................................................................................................22

Defendant Avtandil Kalandadze, by and through his counsel, respectfully submits this memorandum and the accompanying exhibits to assist the Court in sentencing him.

## PRELIMINARY STATEMENT

Avtandil ("Avto") Kalandadze, a 47-year-old citizen of the Republic of Georgia, stands before the Court with profound regret over his decision not to comply when the United States Coast Guard ("Coast Guard") ordered the Motor Tanker *Bella 1*, which he captained, to heave to. He acknowledges with great remorse that he made the wrong choice. He is not, however, a man who has lived his life in defiance of the law. He is a seasoned mariner with an otherwise unblemished record whose judgment failed in a moment of extraordinary pressure. Given the unique and aberrant facts and circumstances of this case, and the punishment Avto has already suffered, we respectfully ask the Court to impose a sentence of time served—approximately seven months.

When the Coast Guard first issued its lawful command in international waters, Avto faced an immediate and consequential choice: obey the Coast Guard or follow his employer's contrary direction, accompanied by a veiled threat that Avto understood as directed at him and his family. Avto made the wrong decision. Since then, he has done what he can to accept responsibility and assist the process. He pleaded guilty promptly, sparing the government the resources of further litigation, and he ███████████████████████████████████████████ ███ He cannot undo his decision, but his response to it reflects genuine remorse and accountability.

Avto has also already endured substantial punishment. He has been detained for approximately seven months[1]—just one month less than the low end of the advisory U.S.

---

[1] As set forth in the Presentence Report (PSR) at 1, Avto was arrested on January 13, 2026, pursuant to a warrant executed by FBI and HSI agents. By the time he is sentenced on August 7,

Sentencing Guidelines range—under unusually difficult conditions.  He endured a weeks-long Atlantic Ocean crossing on a Coast Guard vessel, followed by months of incarceration in a foreign country where he does not speak the language fluently, far from family and friends.  Avto has not seen his family for almost a year, the longest he has ever been away from home.  He is the family's principal financial provider as well as a critical source of emotional support across three generations.  He also faces likely transfer to immigration custody after his federal sentence, notwithstanding efforts to secure his prompt removal to his home country of Georgia.

The question is not whether Avto should be punished; he already has been.  The question is whether additional incarceration would serve a legitimate sentencing purpose—and it would not.  The offense arose from an exceptional maritime situation and, in any event, Avto will never again exercise such poor judgment.  The punishment Avto has already suffered and will suffer—seven months of custody (and further immigration detention), a public federal prosecution, and the likely loss of his career—already provides specific and general deterrence.  And additional incarceration will benefit no one.  For these reasons, and those set out below, a sentence of time served is sufficient and appropriate, and anything more is greater than necessary to serve the purposes of sentencing.

## PROCEDURAL HISTORY

On January 7, 2026, United States law enforcement officers seized *Bella 1* in international waters between Iceland and the United Kingdom, restricting the movement of its crew.  Six days later, on January 13, the FBI and HSI arrested Avto onboard *Bella 1*, and he has remained in federal custody since then.  He is the only *Bella 1* crew member charged by the United States.

---

2026, he will have spent approximately seven months in custody.  *See* 18 U.S.C. § 3585(b)(1) (crediting "any time [defendant] has spent in official detention prior to the date the sentence commences . . . as a result of the offense for which the sentence was imposed"); Minute Entry, *United States v. Rijo-Cedano*, 16 Cr. 481 (D.P.R. Feb. 8, 2017) (Delgado-Colón, C.J.), ECF No. 101 (calculating arrest date from when failure-to-heave-to defendant "remain[ed] shackled" under "official detention of the Coast Guard" in international waters).

On February 15, after a long and difficult journey to the United States, Avto arrived in Puerto Rico and was detained in a federal facility there for approximately three months. In May, he was transported to the Washington, D.C. metropolitan area and detained in the Northern Neck Regional Jail in Warsaw, Virginia. ████████████████████████████

████████████████████████████████████████████████████████████

████████    On June 12, at his first appearance before this Court, Avto pleaded guilty pursuant to a plea agreement to one count of failing to heave to, in violation of 18 U.S.C. § 2237(a)(1). *See* Plea Agreement ¶ 1, *United States v. Kalandadze*, No. 26 Cr. 24 (BAH) (D.D.C. June 12, 2026), ECF No. 22 ("Plea Agreement").[2]  The parties agree that Avto's advisory Sentencing Guidelines range is 8–14 months' incarceration, based on a total offense level of 11 and a Criminal History Category of I. *Id.* ¶ 4. Because he has no prior criminal record, Avto qualifies as a "Zero-Point Offender" entitled to a two-level downward adjustment, pursuant to U.S.S.G. § 4C1.1.[3]

## AVTO'S BACKGROUND

### I.    Avto's Upbringing and Career as a Distinguished Mariner

Avto was born and raised in Batumi, Georgia, a small seaside town home to generations of sailors. PSR ¶¶ 42 & n.6, 50. He is the firstborn child of Tamaz Kalandadze, a civil engineer, and Salome Nakaidze, a teacher. *Id.* ¶ 42. He grew up in a loving, stable, multi-generational home with his parents, grandparents, and younger sister; an aunt, uncle, and cousins lived nearby. *See*

---

[2] Avto waived any challenge to venue in the District of Columbia in connection with his guilty plea. *See* Plea Agreement ¶ 7A.

[3] Avto stipulated to a base offense level of 10 under U.S.S.G. § 2A2.4; a two-level increase for use of a special skill in captaining a crude oil tanker under § 3B1.3 (*see* Statement of Offense ¶ 5); a two-level increase for destruction of records and information under § 3C1.1 (*see id.* ¶ 4); a two-level increase for reckless endangerment during flight under § 3C1.2 (*see id.* ¶ 6); and a total five-level reduction due to acceptance of responsibility (§ 3E1.1) and the zero-point offender adjustment (§ 4C1.1). *See* Plea Agreement ¶ 4.

3

Salome, Ex. B-4.  When he married Natia Dzadzamia in 2008, she joined that same household, where they continued to live even after their daughter ▮ was born.  *See* Natia, Ex. B-2.  The couple only recently moved with ▮ to their own home nearby.

Avto is extraordinarily close to his community.  The many letters submitted to the Court on his behalf do more than express affection.  Relatives, friends, neighbors, clergy, colleagues, and crew members—people who know him in different settings and over different periods—describe the same man: compassionate, reliable, law-abiding, disciplined, and instinctively committed to helping others.  Together, the letters portray a life defined by hard work, generosity, faith, devotion to family and community, and quiet selflessness.  One of the most poignant letters comes from Avto's 13-year-old daughter, who decided on her own to write after watching her mother gather letters of support.  *See* Ex. B-3.  Her words convey both the pain of her father's absence and the depth of the bond she shares with him.

From an early age, Avto displayed the qualities that have shaped his life: a "genuine willingness to help without any selfishness or personal gain," Gocha Phutkaradze, Ex. B-12 (friend), an "exceptional sense of responsibility," Khatuna Vasadze, Ex. B-13 (friend), and "high moral principles," ▮ Ex. B-21 (colleague).

Avto was a teenager when Georgia gained independence from the Soviet Union in 1991.  His "school and college years coincided with the . . . [ensuing] widespread unemployment, power blackouts, and general hardship," during which his parents opened their home, offering refuge to displaced individuals.  Vladimer Mzhavandadze, Ex. B-7.  A neighbor of the family for over 30 years writes that Avto "inherited" from his parents "strong, genuine values" of "support," "car[e]," and "attentive[ness]."  Nani Japaridze, Ex. B-25.  Avto's uncle—who lived with the Kalandadzes for five years after fleeing Sukhumi—recalls that when Avto was "still a schoolboy," he "would

quietly get up at five a.m." to "stand in line for bread for the whole family, trying to ease his mother's burden." Ex. B-7.

At school, Avto stood out for his "determination." His math teacher remembers that he "was never satisfied with his achievements and constantly strove to realize his full potential." Nani Apkhadze, Ex. B-29. Avto channeled that determination into a maritime career to which he had long aspired. *See* Manana Gegenava, Ex. B-30 (Batumi Secondary School No. 1 principal) ("[H]e has dreamed of becoming a sailor since childhood."). Zoia Gordadze, who also taught Avto when he was a child, remembers

> [o]n school trips and city explorations, he especially loved walking along the seashore. Batumi, known as the "sea gate" of Geo[r]gia, held a special fascination for him. Watching ships was one of his favorite pastimes, and he dreamt of becoming a sailor. Even in the first grade, when the class was asked to write about "Who do I want to be?", he chose the profession of a sailor – a dream he would later fulfill . . .

Ex. B-28.

After graduating with honors from Batumi Maritime Academy and serving in the Georgian Navy, Avto began his maritime career as a cadet in 2001. PSR ¶¶ 58–59. He advanced steadily through the ranks and, in 2020, became master of his first vessel. *Id.* ¶ 63. His mother proudly recounts how, "through selfless dedication, continuous study, and unwavering commitment to his goal, he achieved the highest rank – that of Captain." Salome, Ex. B-4. As master, Avto was responsible for the vessel's safe operation, the welfare of its crew, and the secure carriage of its cargo. His colleague, ███████████ who has sailed for 19 years, has "never met anyone as . . . dedicated to his profession as Avtandil." Ex. B-23.

## II.    Avto's Devotion to Three Generations of His Family

Avto is the anchor of an exceptionally close-knit family. He is a "devoted husband" and father, a role model to his younger sister, and "an extraordinary" caretaker to his aging parents and

5

in-laws. Tea Nakaidze, Ex. B-10. His long-time neighbors say that he "has always been and remains an exemplary person," Lali Akhaladze, Ex. B-26, and they have watched him grow from a child to "the steadiest pillar of his family – supporting them through his hard work and constant care," Nani Japaridze, Ex. B-25. His sister knows that with Avto "by my side, I always felt less burdened by everyday challenges, because I knew that he could solve anything." N. Kalandadze, Ex. B-5.[4]

When Avto and Natia married in 2008, they yearned to become parents. Their dream came true five years later. Natia writes:

> ███████████████████████████████ Throughout it all, Avto stood by my side, supporting and encouraging me every step of the way. It is hard to put it into words just how much that meant for me. I already knew Avto was a reliable man, but the human qualities, the depth of his care he showed towards me during that time was beyond anything I could have imagined. It deepened our love and respect for each other.

Ex. B-2.

Avto's career has required months away from his family at a time. *See* PSR ¶¶ 47–48. Even when at sea, however, "Avto always manages to stay fully involved in our family life – from daily decisions to solving problems," Natia, Ex. B-2, and his sister says "Avto called us every day," N. Kalandadze, Ex. B-5. When home, Avto is a loving and devoted father. To ███, her father is "the most important person" in her life. Ex. B-3. She describes how he takes her "to the sea and the river" on trips, *id.*—which is what he would be doing if he were home this summer (and which he very much hopes to do if he returns home in August).

---

[4] Avto's wife and younger sister share the same given name: Natia. *See* PSR ¶¶ 43, 46. We refer to his sister herein as "N. Kalandadze."

Avto's support for extended family is exceptional.  His parents have faced "many serious challenges" that imposed a "great financial and emotional burden" on the family over the last three years.  Salome, Ex. B-4.  Both now require continuing medical care.  More than three years ago, Tamaz fell at work, ███████████████████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████ *Id.*  He can no longer work.  *See* PSR ¶ 45 (noting Tamaz is ████████████████████████████████████████████████████████████). Shortly afterward, Salome underwent ██████████████████, *id.* ¶ 54; complications required six additional procedures and resulted in "enormous cost."  N. Kalandadze, Ex. B-5.  She remains ███████████████████████████████████.  *See* Darejan Kalandadze, Ex. B-8 (aunt). Throughout these crises, as his mom writes:

> Avtandil was not only our son, but also a protector, caregiver, and a source of support for the whole family.  When ████████████████ ████████████████, he encouraged me.  When we lost hope, he gave us strength.

Salome, Ex. B-4.  Avto "fully took upon himself" responsibility for the family's "financial security."  N. Kalandadze, Ex. B-5.  He became "the only breadwinner in our family," Salome, Ex. B-4, paying for his father's ████████████ and his mother's ████████████, including four trips to Turkey for ████████████, *see* PSR ¶ 54.  Natia explains that Avto's employment "carries a heavy responsibility toward our entire family."  Ex. B-2.

Avto bears financial responsibilities that span multiple generations.  *See* Natia, Ex. B-2; Salome, Ex. B-4.  His brother-in-law Besiki describes him as "truly [a] lifeline," Ex. B-6.  When Besiki's 12-year marriage "fell apart," the ensuing stress "affected [his] health," and he required a ██████████████████████.  *Id.*  Besiki recalls: "Avto didn't give me a chance to worry.  He quickly handled all the organizational matters, fully covered the financial expenses, and ████████████████

████████████████████████████████████████████████" *Id.* Besiki earns a living making furniture on commission; when he later struggled to repay a bank loan, Avto again "step[ped] up to the plate," out of "pure kindness and generosity." *Id.*

Avto's cousins tell the same story. Soso Nakaidze is a "successful" dentist whose "professional achievements would not have been possible without Avtandil's help." Ex. B-9. When tuition and living expenses were beyond his parents' means, Avto "was the main person who stood by me" and "consistently helped cover my tuition and living expenses," enabling Soso to earn his degree. *Id.*

Another cousin, Tea Nakaidze, similarly writes that when she moved to Batumi, her family could not afford an apartment. Ex. B-10. "[A]t that critical moment," Avto paid for her tuition and, echoing the example set by his own parents, "opened his home" to her for seven years, giving her "not only housing, but also family warmth, attention, and the reassuring feeling that I was not alone." *Id.* Tea says her story is not unique; Avto "has made life easier for many people, given them hope for the future, and stood by them in difficult times." *Id.*

Even his colleagues know him as "distinguished by his love for his family and strong family values." Ex. B-21. ███████████, who served with him aboard *Bella 1*, recounts how each crew member's "use of the Internet on the ship was strictly limited" to 500 megabytes a day—about one hour of WhatsApp video calling—"which often quickly ran out due to technical failures." *Id.* Avto "always tried to ensure that no one was left without contact with his family," even "selflessly shar[ing] his [own] Internet so that family members could connect. This was an ordinary daily act for him, not a one-time help." *Id.*

### III.    Avto's Life Has Been Characterized by Generosity, Selflessness, and Integrity

One of Avto's defining traits is his generosity—not only to family, but also to friends, neighbors, and "often even for complete strangers." Besiki Dzadzamia, Ex. B-6. He does not

8

advertise his good deeds. Tea describes his "support" as "completely selfless and genuine," given without "expect[ation of] anything in return for his kindness." Ex. B-10. He has taught ██ "how to love and respect others, how to care for people and how to support them." Ex. B-3.

Several letters recount occasions when Avto instinctively acted to protect others at personal risk. His sister writes that "he has always loved taking care of others" and "always was ready to save others, even at the cost of his own life." N. Kalandadze, Ex. B-5. For example, when Levan Natroshvili's then 16-year-old daughter was "swept away by a sudden powerful wave while swimming in the sea," Avto, who was swimming nearby, "rushed towards her without hesitation, despite the risk to his own life." Ex. B-15. Avto "never abandoned the child until the lifeguards were able to bring them both to safety," and sustained injuries himself that required medical attention. *Id.*

Childhood friend Jaba Tughushi likewise remembers that Avto "remained calm, acted swiftly, and safely pulled me out of the water" when Jaba found himself "in a dangerous situation while swimming at sea." Ex. B-17. Natia recounts that "when a neighbor's child had a health scare," Avto administered "first aid until the emergency team arrived." Ex. B-2. Avto's cousin Tea recalls yet another incident that "left a profound impression" on her:

> To this day, I am not sure what was more striking – the event itself or Avtandil's response. Avtandil was sitting and relaxing on his balcony when he saw his Turkish neighbor's three-year-old son fall from the second floor. Without hesitation, he jumped down from his own balcony, provided first aid, put the unconscious child and his mother in his car, and drove them to the nearest hospital. His quick actions saved [the] little boy's life. The child's parents continue to express their gratitude to Avto to this day.

Ex. B-10. These episodes are not offered as embellishment. They reveal a settled instinct: when another person is in danger, Avto acts.

9

Avto's friends describe the same readiness to help even when the call for assistance is more subtle; he is the "first person" to offer support when life becomes difficult. *E.g.*, Aleksandre Shelia, Ex. B-16.  Among many examples:

- George Bzsikadze, a colleague and classmate at the Maritime Academy, writes that when George's uncle died shortly before the New Year, he had to organize the funeral, which was "especially difficult because everything was closed for the holiday." But Avto "never left my side," helping George "[i]nstead of spending the New Year with his own family." Ex. B-14.

- Levan Nodia, a friend since the first grade, writes that when he and his family were at risk of eviction due to foreclosure, Avto "covered our loan, which allowed us to keep the home my father had built." Ex. B-18.

- Khatuna Vasadze, a friend and mother of Avto's godchild, writes that Avto "has arranged countless unforgettable surprises for his godchild - unexpected visits on birthdays, thoughtfully chosen original gifts, and moments that remain in our child's memory forever." And when Khatuna's family moved to Batumi, Avto "became our greatest supporter. . . . With love and care, he designed, arranged, and personally oversaw every detail" of interior design, "turn[ing] it into a home where we could feel happy." Ex. B-13.

The point is not simply that Avto is generous with money; rather, his first instinct is to offer his time and resources to improve the well-being of others. *See, e.g.*, *id.* (explaining that, to Avto, "the joy of others is just as important to him as his own").

That character is recognized well beyond Avto's family and friends. *See* Gocha Phutkaradze, Ex. B-12 (colleague explaining that Avto "has always been distinguished by his law-abidingness, justice, and a high sense of civic responsibility" and that he "enjoys genuine trust and respect in society"); Lasha Komakhidze, Ex. B-32 (former mayor of Batumi noting that Avto "stands out for his . . . strict adherence to ethical principles"). Since Avto's arrest, "[t]he whole city is deeply concerned and worried about him, eagerly awaiting any news," and his speedy return will mean that he can "continue doing good for those around him, as he has selflessly done for years." N. Kalandadze, Ex. B-5.  The breadth of that support matters: it comes not only from loved ones, but also from civic leaders and neighbors who have observed Avto over decades.

10

Avto is a pious and active member of the Church of Transfiguration community.  His priest describes him as a man who "deeply respects family and social values, upholds high moral principles, and strives to live his life with dignity."  Archpriest Basili Beridze, Ex. B-31.  Avto "firmly believes that love and devotion should be proven not with words, but by deeds."  Besiki, Ex. B-6.  His brother-in-law recalls how years ago, when their church was being rebuilt, Avto "selflessly . . . worked alongside the other men with joy and dedication, because he believed he was doing something truly good and useful."  *Id.*; *see* Natia, Ex. B-2 ("He regularly donates to churches and monasteries and takes part physically in their construction or in obtaining necessary supplies.").

The same qualities appear in Avto's professional life.  Former crew members and colleagues, including those on *Bella 1*, describe a captain who placed crew safety above his own comfort, resolved conflict calmly, provided medical assistance when needed, and accepted personal responsibility for the welfare of the men under his command.  *See generally* Ex. B-12, 14, 20–24.

██████ who managed the day-to-day operations of *Bella 1*, writes that, to Avto, the "safety and welfare of his crew were always more important to him than his own.  Throughout our entire contract [on *Bella 1*], not a single crew member ever felt unsafe under his command."  Ex. B-23; *see* ████████, Ex. B-24 (recognizing how "safety of the crew has always been of utmost importance" to Avto).  ████████ a junior officer on *Bella 1*, says this was "especially" true "during the period when American servicemen were on board" in January 2026.  Ex. B-22.  Avto "consistently looked after the physical and psychological well-being of the crew," and "would actively check on anyone who seemed anxious or scared and offered his support."  *Id.*

11

Indeed, "[e]ven while he was being arrested, his greatest concern remained the well-being of his crew." ▮ Ex. B-23.

Avto's sense of responsibility for his crew "extended far beyond his official duties." ▮ Ex. B-21. The letters provide concrete examples:

- ▮ writes that when Avto learned of ▮▮▮, Avto ▮▮▮ Ex. B-23.

- ▮ recounts another instance when ▮▮▮ Captain Avtandil took him under his personal supervision. ▮▮▮ Ex. B-21.

- Avto, at his "own initiative" and "personal expense," "purchased essential first-aid medications and multivitamins, ensuring the crew had necessary medical supplies on board." *Id.*

- ▮ and ▮, both of whom boarded *Bella 1* months before Avto, each recount that within Avto's first week onboard, he "fully resolved" a longstanding conflict between the deck and engine room crews, thereby "restoring a healthy working environment." *Id.*; *see* ▮ Ex. B-22.[5]

- ▮ and ▮ similarly write of Avto's sincere efforts to "significantly boost[] the crew's morale and overall mood" by installing, for example, table tennis, a gaming corner, and gym equipment. ▮ Ex. B-21; *see* ▮ Ex. B-22.

- Just as important, experienced mariners seek Avto's counsel because of his judgment. George Bzsikadze, a captain who lives in Batumi, says: "I often had to manage difficult situations. In those moments, Avto was frequently the one who offered sensible advice and helped me make the right decisions. His clear vision and calm approach helped me assess challenging circumstances properly. He always remains composed and avoids unnecessary conflicts." Ex. B-14. Gocha Phutkaradze likewise knows Avto's "professional experience and advice" is "consistently competent, comprehensive and grounded in professional standards." Ex. B-12. ▮ describes a captain for whom "[o]rder, compliance with the law, and adherence to professional ethics" were paramount. Ex. B-21.

---

[5] Avto's role as a peacemaker dates to his youth. His math teacher describes his ability to "skillfully defuse conflicts with both peers and elders" without resorting to physical strength. Nani Apkhadze, Ex. B-29. Family members say that "he has always tried to resolve any disagreement calmly through reasoning, conversation, and warm words," Natia, Ex. B-2, and "never loses his composure and approaches everything with full responsibility, always striving to make the right and best decision," Besiki, Ex. B-6.

These letters show that Avto was not merely a competent captain; he is a humane and principled leader.  His 25-year record at sea and home—not the isolated conduct that brings him before the Court—defines who he is.

## OFFENSE CONDUCT

**I.    After More Than a Year of Unemployment, Avto Accepted Employment on *Bella 1***

Before his arrest, Avto generally obtained maritime work through crewing agencies that serve as intermediaries between crew members and shipowners.  Following Russia's invasion of Ukraine in February 2022, however, opportunities became scarce, and by August 2025, Avto had been unemployed for more than a year.  *See* PSR ¶ 63 & n.6.  He was then offered a four-month contract to serve as master of *Bella 1*.  His initial dealings with the company's representatives resembled those in his prior engagements, and the salary he was offered (in Euros) was consistent with his prior compensation.

Before accepting, Avto researched the vessel through public shipping databases.  He learned that *Bella 1* was a crude oil tanker owned by a Turkey-based company, sailed under the Guyanese flag, and was sanctioned by the U.S. Treasury Department's Office of Foreign Assets Control (OFAC).  Because he was not a U.S. citizen and understood that he would operate in international waters, Avto did not believe that accepting the position was unlawful.  He boarded the vessel on or about September 1, 2025.

Avto soon encountered circumstances unlike those of his prior voyages.  For example, Avto's employer through whom he took instruction, who was referred to as the "operator" of *Bella 1* and identified only by a first name, communicated with Avto through a ship phone and issued piecemeal instructions rather than providing a full itinerary.  *Bella 1* also had a "cargo security manager," who monitored the crew's compliance with the operator's instructions and reported back to the operator.  When Avto boarded, *Bella 1*'s outgoing captain told him that the

13

vessel's Automatic Identification System (AIS) (which broadcasts a vessel's identity, GPS position, and speed to other nearby vessels) was already turned off and was to remain off until the operator directed otherwise. These circumstances were irregular, but despite them, Avto continued to serve as master and followed the operator's directions.

## II.    Dissension Onboard *Bella 1* and Subsequent U.S. Coast Guard Interaction

On or about December 17, 2025, while *Bella 1* was drifting in the Atlantic Ocean, the operator informed the crew that the vessel would be renamed, transferred to new ownership, and reflagged under the Russian flag. That announcement triggered deep concern among many crew members, including Ukrainian nationals who feared retaliation from their own government if they worked under the Russian flag. Unable to disembark the vessel at sea, the protesting crew had few options.

On or about December 19, 23 of the 28 crew members aboard *Bella 1*, including Avto, signed a letter refusing to work on a Russian-flagged vessel and demanding that they be replaced.[6] Around the same time, Avto signed a separate letter abdicating responsibility for the vessel to the new owner. He then placed the ship phone through which he received the operator's directives on the bridge, where any officer on watch could read and implement the incoming instructions. At that point, Avto understood his remaining responsibility to be the safety of the crew. Although he had not yet been formally replaced as master, he no longer exercised the same command discretion.

On December 20, at approximately 8:53 p.m. Eastern Time, while *Bella 1* was unanchored in the Caribbean Sea, the Coast Guard Cutter *Munro* approached, displayed its blue law enforcement lights, and hailed the vessel by radio. Avto responded, identified himself as the master, and answered customary "right of approach" questions, which he understood to permit an officer to verify a vessel's flag and nationality in international waters. The *Munro* ordered *Bella 1*

---

[6] Avto was subsequently informed by the operator that the crew would be replaced on or about January 20, 2026, during the next port call at Willemstad, Curaçao.

14

to follow it on a southwest course while its claim of nationality was verified. Avto confirmed that *Bella 1* would follow the Coast Guard as directed.

While Avto was responding by radio, however, the cargo security manager informed the operator of the Coast Guard's actions. After the exchange ended, the cargo security manager handed Avto the phone, and the operator ordered Avto to disregard the Coast Guard and chart a course away from the *Munro*. The operator dictated the coordinates, speed, and turns. He reminded Avto that *Bella 1* was not Avto's vessel and warned that "we'll find you" if he refused— a statement Avto understood as a threat to him and his family. Out of fear for his and his family's safety, Avto entered the coordinates and steered away from the *Munro*.

The next morning, at approximately 6:30 a.m., the Coast Guard hailed *Bella 1* on two radio channels, advised that its claim of nationality was denied and that the United States was exerting jurisdiction over the vessel, and ordered *Bella 1* to heave to for a law enforcement boarding. The Coast Guard repeated its hails every 30 minutes.

At the operator's command, *Bella 1* did not respond. From the Coast Guard's order on December 21, 2025, until U.S. forces boarded on January 7, 2026, the operator ordered the crew where to go and what to say to the Coast Guard, and such orders were enforced by the security manager. During that period, Avto and other officers, rotating on watch, entered the coordinates and steering instructions at the operator's direction. Though he felt at the time that he had little alternative given his fear, Avto knows and regrets that he made the wrong choice.

## THE PROBATION OFFICE'S RECOMMENDATION RESTS UPON FACTUAL PREMISES UNSUPPORTED IN THE RECORD

The Probation Office recommends a sentence of 12 months and one day. Its rationale, however, incorrectly attributes conduct to Avto that is not part of the record, and therefore overstates his offense. The recommendation recounts an unsolicited statement from members of

15

*Bella 1*'s engine department, Sentencing Recommendation at 2, even though the PSR records the parties' agreement that the central accusations in this letter were inaccurate, *see* PSR ¶ 17a–17d. The parties agree that Avto did not tell the crew they were under "pirate attack" and did not threaten to withhold wages or obstruct repatriation. *Id.* ¶ 17a, c. The parties further agree that the PSR's description of the engine department's letter incorrectly conflated the Chief Officer with the Cargo Security Officer, who were different people. *Id.* ¶ 17d. Allegations the parties agree are inaccurate should play no role in determining Avto's sentence.

The recommendation also asserts that Avto "abided by orders of the ship's Operator to deactivate the ship's Automatic Identification System to conceal the ship's movement from Iran to Asia." Sentencing Recommendation at 1. That is incorrect, however, as a matter of fact. Avto did not deactivate the AIS or order anyone else to do so. And the Statement of Offense does not say that he did. Rather, it says only that, "at the instruction of the Operator, the *Bella 1* sailed from Iran to Asia with its [AIS] deactivated." Statement of Offense ¶ 1, *Kalandadze* (D.D.C. June 12, 2026), ECF No. 23. This is an important distinction, and Probation's recommendation inaccurately attributes to Avto an affirmative act that he did not commit and is not supported in the record.

The recommendation also does not explain why 12 months and one day is appropriate in light of the Probation Office's own sentencing data. This data reflects that for defendants with the same primary Guideline, offense level, and Criminal History Category, the average and median sentences over the last five fiscal years were eight months. *See id.* ¶ 96. Probation's recommendation is more than four months above that median, while the requested sentence is only one month below the median (and one month below the applicable advisory Guidelines range).

In sum, the Probation Office relies upon inaccurate facts to support a recommended sentence well above that which is reflected by its own proffered sentencing data. To the contrary,

16

that same data supports a modest variance from the advisory Guidelines range to a sentence of time served.

Finally, in making its recommendation, the Probation Office does not give due weight to the important § 3553(a) factors that courts must consider in fashioning an appropriate sentence, and which, as described *infra*, support a sentence of time served.

## RELEVANT SENTENCING CONSIDERATIONS

### I.    Applicable Legal Standard

When sentencing individuals, the Court must fashion "a sentence that is sufficient, but not greater than necessary, to achieve the overarching sentencing purposes of retribution, deterrence, incapacitation, and rehabilitation." *Rosales-Mireles v. United States*, 585 U.S. 129, 132–33 (2018) (internal quotation marks and citations omitted).

"It has been uniform and constant in the federal judicial tradition for the sentencing judge to consider every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensue." *Pepper v. United States*, 562 U.S. 476, 487 (2011) (quoting *Koon v. United States*, 518 U.S. 81, 113 (1996)).  The sentencing factors outlined in 18 U.S.C. § 3553(a) took on renewed vitality in the aftermath of *United States v. Booker*, 543 U.S. 220 (2005), which directs sentencing courts to treat the Guidelines and policy statements only as "the starting point and the initial benchmark," and cautions that courts may "not presume that the Guidelines range is reasonable" or use the Guidelines as "the only consideration" in its chosen sentence.  *Gall v. United States*, 552 U.S. 38, 49–50 (2007); *accord United States v. Khatallah*, 41 F.4th 608, 643–44 (D.C. Cir. 2022).

Thus, the Court, in fashioning an appropriate sentence, "shall" consider the following:

> (1) the nature and circumstances of the offense and the history and
>      characteristics of the defendant;

(2) the need for the sentence imposed—

    (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

    (B) to afford adequate deterrence to criminal conduct;

    (C) to protect the public from further crimes of the defendant; and

    (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner; [and]

. . .

(6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct.

18 U.S.C. § 3553(a).

Avto's advisory Guidelines range of 8–14 months' incarceration is only the starting point for the determination of an appropriate sentence. The remaining § 3553(a) factors—including his status as a zero-point offender, the absence of any prior criminal misconduct, the unusual circumstances of the offense, the severity of the custody he has already endured, his extraordinary family responsibilities, and the collateral consequences that will follow—support a sentence of time served.

## II.    The Guidelines' Treatment of Zero-Point Offenders Strongly Supports Time Served

Avto is precisely the type of first offender for whom the Sentencing Commission concluded that a noncustodial sentence is generally appropriate. He has no criminal history points, qualifies for the U.S.S.G. § 4C1.1 adjustment, and falls within Zone B of the Guidelines table. *See* Plea Agreement ¶ 4(D); PSR ¶¶ 33, 37, 70–72.

Under these circumstances, the Guidelines recognize that "a sentence other than a sentence of imprisonment . . . is generally appropriate." § 5C1.1 n.9. This recognition is consistent with

18

Congress's mandate that the Commission "shall insure that the guidelines reflect the general appropriateness of imposing a sentence other than imprisonment in cases in which the defendant is a first offender who has not been convicted of a crime of violence or an otherwise serious offense," 28 U.S.C. § 994(j), and rests on empirical evidence that zero-point offenders like Avto "have considerably lower recidivism rates than other offenders," U.S.S.G. App'x C, amend. 821; *see also id.* amend. 836 (revising application note).

Avto's offense is non-violent and not "otherwise serious."[7]  Nor is there a realistic reason to believe Avto will reoffend, and no meaningful public-safety justification for further incarceration.  He has already served approximately seven months—far in excess of a non-incarceratory sentence contemplated under § 5C1.1.  A one-month variance to a sentence of time served merely recognizes that Avto has already served more time in prison than the Commission contemplated was appropriate for similarly situated first offenders.

## III.    Section 3553(a) Factors Support a Sentence of Time Served

Taken together, the § 3553(a) factors militate against any additional incarceration.  Avto's offense was a grave but aberrational failure of judgment.  His history is defined by work, family, service, and integrity.  Further imprisonment would add little to deterrence or public safety while inflicting concrete harm on the wife, child, parents, and relatives who depend on him.

---

[7] Through the exclusions set forth in U.S.S.G. § 4C1.1(a)(2)–(11), the Commission has identified crimes that are violent or "otherwise serious"—none of which apply here.  In addition, Avto's base offense level (10) refers to § 2A2.4(a) (obstructing or impeding officers).  As discussed *infra*, the scope and effect of Avto's conduct were non-violent, and his failure to obey the Coast Guard occurred under veiled threats from his employer.  *See* 28 U.S.C. § 994(m) (mandating that the Commission "insure that the guidelines reflect the fact that, in many cases, current sentences do not accurately reflect the seriousness of the offense").

### A.    Avto's Personal History and Characteristics Warrant Leniency

The record makes clear that Avto's offense is not a fair measure or depiction of who he is. He is the son who assumes the financial and emotional weight of his family, the husband who unconditionally loves and supports his wife, the father whose daughter calls him the most important person in her life, the captain whose crew knows him as their protector, and the neighbor whose instinct is to help before he is asked.  The letters submitted on Avto's behalf are not merely sentimental submissions, but consistent evidence, from independent sources, of the fact that Avto has centered his life around responsibility, service, and decency.

If sentenced to time served and allowed to return home promptly, Avto will resume what he has always done: care for his family, support the people around him, and contribute to his community.  This is not speculation; it is the settled pattern of his life.  Respectfully, the Court should assess Avto's offense in the context of his whole life and not permit one terrible decision to overwhelm the abundance of good.

Moreover, no one else can readily assume Avto's role.  His parents are ███████, his wife is not employed, and no other relative provides comparable, steady support.  *See* PSR ¶¶ 45–49, 54.  Since his arrest, Natia has had to sell a family car and land to meet basic expenses.  *Id.* ¶ 67. Avto's family now "live[s] very economically, covering only essential expenses - food, utility, and medical needs - because our near future remains quite uncertain," and Avto's arrest has left Natia "facing those devastating problems alone."  Natia, Ex. B-2.  Further incarceration would therefore punish not only Avto but also the family members who depend upon him.

### B.    The Nature and Circumstances of the Offense Also Support a Sentence of Time Served

Avto deeply regrets his decision to obey the operator rather than comply with the Coast Guard's command, and he accepts full responsibility.  *See* Avtandil Kalandadze, Ex. B-1.  The

context surrounding his conduct is also critical. The operator controlled the vessel, issued commands in real time, and made veiled threats to ensure Avto's compliance. Avto was not the architect of the scheme; he was the captain placed in the middle of a coercive situation with limited practical options and legitimate fear for his family.[8] That context does not excuse Avto's conduct, but it does explain why an otherwise law-abiding mariner with a quarter-century career made the worst decision of his life. Moreover, as bad as this decision was, Avto's conduct did not involve an act of violence or cause injury, nor did Avto contemplate that his actions could jeopardize anyone's physical safety.

> **C.    A Sentence of Time Served Fully Satisfies the Purposes of Deterrence, Protection of the Public, and Just Punishment**

The Court must fashion a sentence that "afford[s] adequate deterrence to criminal conduct," "protect[s] the public from further crimes of the defendant," and "provide[s] just punishment for the offense." 18 U.S.C. § 3553(a)(2)(A)–(C). Time served fully satisfies each purpose.

---

[8] The Sentencing Commission has long recognized that circumstances in which a defendant's conduct results from imperfect coercion or duress may support a below-Guidelines sentence. *See, e.g.*, U.S.S.G. § 5K2.12 (2024) (policy statement) (permitting downward departure "[i]f the defendant committed the offense because of serious coercion . . . or duress, under circumstances not amounting to a complete defense"). Effective Nov. 1, 2025, the Commission removed departures and policy statements related to specific personal characteristics, including § 5K2.12, to reflect the post-*Booker* shift towards variances. In so doing, the Commission explained the amendment is intended to be "outcome neutral" and "that judges who would have relied upon facts previously identified as a basis for a departure would continue to have the authority to rely upon such facts to impose a sentence outside of the applicable guideline range as a variance under 18 U.S.C. § 3553(a)." *Id.* ch. 1, pt. A (2025).

Further, the Commission has sought to mitigate conduct on similar grounds. For example, the Guidelines provide a two-level reduction for certain firearms traffickers if the offender was "motivated . . . by threats or fear to commit the offense and was otherwise unlikely to commit such an offense." § 2K2.1(b)(10). The Commission also considered—but did not ultimately adopt—an amendment for economic defendants who "committed the offense at the direction of his or her employer for fear of negative employment consequences," 90 Fed. Reg. 59660, 59678 (Dec. 19, 2025).

**1.    Deterrence Has Already Been Achieved and No Further Incarceration is Necessary**

Specific deterrence has been achieved.  Avto's acceptance of responsibility is genuine and clear.  He pleaded guilty without delay or minimization and ███████████████████████ ████████████████████████.  *See* PSR ¶¶ 31–32.  Given those actions, together with the consequences he has already endured, *see infra*, he poses no risk of reoffending.

General deterrence has also been satisfied by the public nature of this case.  *See, e.g.*, Nicholas Nehamas, Seamus Hughes & Christiaan Triebert, *U.S. Indicts Captain of Oil Tanker Seized After Coast Guard Pursuit*, N.Y. Times (Feb. 17, 2026), https://www.nytimes.com/2026/02/17/us/politics/us-coast-guard-oil-tanker-captain-venezuela; Press Release, U.S. Dep't of Just., *Master of Shadow Fleet Tanker Pleads Guilty in D.C. for Evading U.S. Coast Guard During Weeks-Long Pursuit* (June 12, 2026), https://www.justice.gov/usao-dc/pr/master-shadow-fleet-tanker-pleads-guilty-dc-evading-us-coast-guard-during-weeks-long; Polina Ivanova, *The Sailors Who Keep 'Ghost' Tankers Moving*, Financial Times (May 8, 2026), https://www.ft.com/content/e3f2767a-1da1-4669-ae8c-fe47b7a42896?syn-25a6b1a6=1 (reporting Avto "faces up to 10 years in jail").  The seizure of *Bella 1* and the federal prosecution of its master have sent a clear public message that defying the Coast Guard carries serious consequences.  A mariner considering similar conduct will see seizure, prosecution, seven months of difficult custody in a foreign country, likely career loss, and deportation—not leniency.  No further imprisonment is necessary to effect deterrence.

Nor does public safety require further incarceration.  The offense arose from a unique maritime situation, not from a criminal disposition.  Avto's 47 years without prior criminal conduct, his 25-year record of professional responsibility, his zero-point offender status, and his prompt acceptance of responsibility are far better predictors of future conduct than this singular mistake.

2.    **Seven Months of Harsh Pre-Sentence Detention Constitutes Substantial Punishment**

Avto has already been justly punished.  He has been detained for approximately seven months under unusually difficult conditions.  *See* PSR at 1–2; *see generally id.* ¶¶ 1, 7, 48.  His path to this Court was neither ordinary nor easy.  After *Bella 1* was interdicted in international waters on January 7, 2026, his movement was restricted; he remained without criminal charge, consular access, or meaningful clarity about what would happen next until his arrest on January 13.

His detention was further complicated when, while the vessel remained anchored in the Moray Firth, his family retained Scottish counsel and sought review of the lawfulness of his confinement in the Court of Session in Edinburgh.  Before that challenge could be meaningfully resolved, however, U.S. authorities removed Avto and the first officer from *Bella 1* and began transporting them across the Atlantic Ocean, beyond the territorial waters of the United Kingdom and beyond the practical reach of the Scottish court.  *See* David Cowan, *U.S. Remove Tanker Captain from U.K. Waters as Crew Set to Leave Scotland*, BBC News (Jan. 27, 2026), https://www.bbc.com/news/articles/cgqep9pvygko (tracking chronology of events and quoting sources that crew members' "judicial review can no longer be enforced" under Scottish law).  The episode underscores just how disorienting and unusual Avto's detention was: he was held for weeks in a foreign setting, without meaningful access to family or counsel, while efforts to test the legality of his confinement were thwarted by his removal.

Avto's ensuing crossing of the Atlantic Ocean was punishing.  For approximately three weeks, Avto was detained in an uncovered area on the upper deck of the *Munro* in rough weather.  Despite being a seasoned captain, he became so seasick that he required several doses of antinausea medication.  He had no change of clothes for weeks, woke up on multiple occasions partially

23

submerged in water, and had virtually no opportunity to communicate with family or counsel. During this period, Avto did not know where he was going or what he would face upon arrival.[9]

On February 15, Avto was paroled into the United States through Puerto Rico. Two days later, he was presented in the District of Puerto Rico, *see* Minute Entry, *United States v. Kalandadze*, No. 26-mj-119 (D.P.R. Feb. 17, 2026), ECF No. 3 (Ramos-Vega, M.J.), and detained in Bureau of Prisons ("BOP") custody at MDC Guaynabo in Puerto Rico. Although told that he eventually would be transferred to the Washington, D.C., area, he did not know when. He braced daily for relocation until, almost three months later, he was awakened before dawn on May 8 and transported over the next three days to the Northern Neck Regional Jail in Virginia.

Calendar time alone understates the punitive force of these seven months. Avto endured uncertainty about the basis and destination of his detention, hazardous weather, near-total communication blackouts with family and counsel, disrupted medical care,[10] and repeated transfers without meaningful notice. His custody has been substantially harsher than the ordinary

---

[9] Avto was detained for 34 days between his January 13 arrest and February 15 arrival in the United States. Commentators report that criminal defendants interdicted in international waters are delayed by an average of 19 days between arrest at sea and date of arrival. *See cf.* Kendra McSweeney, Mat Coleman & Douglas A. Berman, *The Challenge of Just Federal Sentencing for Boat Defendants,* 37 Fed. Sent'g Rep. 103, 106 (2025) (collating data in Title 46 maritime drug charges). It is the rare arrestee – less than 19% – who spends more than 30 days in detention before presentment to a magistrate judge. *Id.*

[10] Avto suffers from medical conditions that require ongoing treatment. ██████████████ ███████████████████████████████████████████████ *See* PSR ¶¶ 52–53. Upon arriving at the Northern Neck facility where he is currently housed, ████████████████████████ ████████████████████████████████████████ His medical needs are another reason the Court should decline to extend his confinement beyond what he has already served.

experience of a pretrial detainee.  For a first-time offender who poses no ongoing danger, that punishment is more than sufficient.

### 3.    Avto Faces Significant Collateral Consequences Beyond this Court's Sentence

Even if sentenced to time served, Avto will continue to suffer punishment.  He does not intend to contest removal from the United States.  *See* PSR ¶ 50.  But the practical result may be the loss of the only livelihood he has ever known, one he spent more than 25 years building and that supports three generations of his family.

Avto did not voluntarily enter the United States or seek admission here.  The government brought him here for prosecution and paroled him into the country, and immigration authorities lodged a detainer upon his arrival.[11]  Although he could seek to litigate certain collateral immigration consequences associated with a judicial order of removal—including future inadmissibility and reentry bars—Avto has chosen not to do so.  Instead, he will consent to a judicial order of removal and seek prompt return to Georgia.  Courts have recognized the anomalous posture of treating a person brought here involuntarily as inadmissible for lacking entry documents,[12] but Avto has elected prompt reunification with his family rather than litigate those collateral issues.

---

[11] Upon information and belief, a noncitizen Form I-247 detainer was lodged against Avto on or about February 15, 2026.  *See* PSR at 2 n.2.

[12] *See cf. Pronsivakulchai v. Gonzales*, 461 F.3d 903, 909 (7th Cir. 2006) (noting, in vacating Board of Immigration Appeals' (BIA) denial of asylum, how panel was "struck" by government's claim that alien is inadmissible for lack of immigration papers "because it disregards how [alien] arrived in the United States [*i.e.*,] by extradition" without "practical" opportunity to "pop home and retrieve her papers"); *Matter of Badalamenti*, 19 I. & N. Dec. 623, 626–27 (BIA 1988) (concluding "an alien paroled into the United States" "against his will" is not "automatically . . . an applicant for admission upon termination of his parole" under immigration law); *see also* Sentencing Judgment at 2, *United States v. Montano Castro*, 16 Cr. 197 (M.D. Fla. Dec. 8, 2016) (Scriven, J.), ECF No. 94 (noting Title 46 defendant "was brought into the U.S. involuntarily to face prosecution; therefore, he is in the country legally").

That choice carries lasting consequences.  A removal order may render Avto inadmissible for at least five years, *see* 8 U.S.C. § 1182(a)(9)(A), and may prevent him from obtaining the crew-member visa required for contracts on vessels that call at U.S. ports or transit U.S. waters.  For a Georgian seafarer whose work is secured through agencies serving international fleets, that restriction may effectively end his career as a master.  Avto is resourceful and hardworking, and he will seek other lawful work, but losing the vocation he pursued since childhood—and the income on which three generations depend—is substantial punishment in its own right.

The immigration detainer also means that Avto is expected to be transferred to immigration custody rather than be released to his family at the end of his federal sentence.  Even with a judicial order of removal, arranging travel and processing removal might take weeks or months.  *See cf.* Nat'l Immigr. Project, *ICE Stipulations to Removal Explainer* (June 2025), https://nipnlg.org/sites/default/files/2025-07/2025_NIPNLG-ICE-stipulations.pdf  (noting  ICE "may take several weeks or months" to "process the person for deportation," even when removal is uncontested); *Zadvydas v. Davis*, 533 U.S. 678, 689 (2001) (permitting post-removal order detention of inadmissible aliens beyond 90 days as long as "reasonably necessary" to effect removal to another country (construing 8 U.S.C. § 1231(a)(6)).  Counsel has sought assurances of prompt removal but has received none.[13]  Thus, a sentence of time served may still be followed by additional confinement of uncertain duration.

Given this, even with a sentence of time served, Avto's confinement will almost certainly continue under challenging conditions in immigration detention that will affect his ongoing medication and care, rendering his punishment more severe than that of a similarly situated U.S.

---

[13] Specifically, counsel has requested that the detainer be lifted and upon completion of his sentence, Avto—with the assistance of counsel—be permitted to self-deport immediately.

citizen. That undeserved severity is a proper basis for a Guidelines departure, *see, e.g.*, Sentencing Tr. at 100:21–22, *United States v. Otunyo*, 18 Cr. 251 (D.D.C. Oct. 11, 2021), ECF No. 116 (Howell, J.) (granting six-month *Smith* departure to account for post-incarceration deportation), *aff'd* 63 F.4th 948 (D.C. Cir. 2023), and, by itself, provides grounds for a variance below the applicable advisory Guidelines range here of 8–14 months' imprisonment.[14]

The Probation Office's recommendation does not account for the full force of these consequences. Time served, by contrast, recognizes that Avto's punishment is already substantial and continuing through lasting employment restrictions, the public stigma of a federal conviction, and immigration detention. *See United States v. Stewart*, 590 F.3d 93, 141 (2d Cir. 2009) (recognizing that a court cannot "properly calibrate a just punishment" without considering a sentence's collateral effects); *United States v. Jaime*, 235 F. Supp. 3d 262, 265 (D.D.C. 2017) (appreciating "potentially devastating collateral consequences of a criminal conviction, including it being an impediment to future employment," in granting pre-judgment probation of first offender under § 3607). Further federal incarceration is unnecessary to achieve specific deterrence, protect the public, or provide just punishment.

### D. The Need to Avoid Unwarranted Sentencing Disparities Supports A Sentence of Time Served

Finally, courts must consider whether a particular sentence would present "unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." 18 U.S.C. § 3553(a)(6).

---

[14] The same logic that warrants a Sentencing Guidelines departure due to the "fortuitous increase in the severity" of a deportable alien's sentence relative to an otherwise identical U.S. citizen, *United States v. Smith*, 27 F.3d 649, 655 (D.C. Cir. 1994), supports a downward variance from the advisory Guidelines range. *See United States v. Thomas*, 999 F.3d 723, 733–34 (D.C. Cir. 2021) (contemplating either "departure or a variance under *Smith*").

A sentence beyond time served would present such an unwarranted disparity, as other similarly situated offenders convicted of offenses under § 2237(a)(1) generally receive sentences less than the seven months that Avto has already served. While some of these defendants had lower Guidelines ranges than Avto,[15] a comparison of the facts nonetheless supports a one-month downward variance for Avto to a sentence of time served.

For example, in *United States v. Frometa-Cabrera*, 24 Cr. 427 (D.P.R.) (Delgado-Colón, C.J.), the defendant, suspected of alien smuggling, failed to heave to in a flagless vessel when approached by a Coast Guard Cutter near Puerto Rico. Instead, the "boat with no markings, or indicia of nationality" led the Coast Guard on a pursuit during which the Coast Guard had to resort to "additional tactics to stop the vessel." ECF No. 56 at 10. These tactics "includ[ed] use of the pepper ball projectile delivery system (PPDS)." *Id.* In that case, the defendant was sentenced to time-served—the equivalent of less than five months. ECF Nos. 2, 15, 86–87. While the defendant's Guidelines range was 0–6 months' imprisonment, there is no explanation as to why he did not receive a Chapter 3 reckless endangerment enhancement, as Avto did. Indeed, that would have been far more appropriate there, where the Coast Guard had to use a projectile to apprehend the vessel. In contrast, while *Bella 1* failed to heed the Coast Guard's order and sailed in a different direction, it did so at the slow pace of approximately 13 miles per hour—far from a

---

[15] Avto stipulated to a total offense level of 11, arising in part from three Chapter 3 enhancements. *See* Plea Agreement ¶ 4. In contrast, a number of other failure-to-heave defendants identified by counsel had a total offense level of 8 (rather than 11), as they had no enhancements, resulting in a 0–6-month Guidelines range.

We do not dispute the application of the advisory Guidelines enhancements to Avto—though we note that the enhancements under U.S.S.G. §§ 3C1.1 and 3C1.2 arise from acts that Avto undertook not on his own initiative but "at the direction of the Operator," Statement of Offense ¶¶ 2, 4, 6, and that were not wanton. Moreover, a comparison of Avto's conduct with the conduct in other failure-to-heave cases supports similar sentencing treatment.

28

high-speed flight or situation that, in Avto's mind (or to any reasonable person), would pose a risk to anyone's physical safety.[16]

Similarly, in *United States v. Del-Rosario*, 23 Cr. 179 (D.P.R.) (Arias-Marxuach, J.), the failure-to-heave defendant, who was apprehended just south of Puerto Rico, engaged in "evasive maneuvers" that caused the Coast Guard to fire warning shots, even after which the defendant "still did not comply with the order to stop." ECF No. 36 at 11. In denying bail, the magistrate judge relied on government evidence that the defendant "jettison[ed] something overboard" and found by a preponderance that he "did engage in conduct that could have resulted in . . . the death of an agent or Coast Guard official" with "clear attempts to flee and to destroy evidence along the way." ECF No. 25 at 3. That defendant, too, did not receive any Chapter 3 enhancements despite apparent recklessness or obstruction and, with a 0–6-month Guidelines range, was sentenced to time-served—approximately 2.5 months. ECF Nos. 7, 49–50.

In *United States v. Santana*, 07 Cr. 20751 (S.D. Fla.) (Graham, J.), where the failure to heed the Coast Guard's directive resulted in the necessity of a Coast Guard helicopter chasing and then boarding the vessel, the defendant was sentenced to six months' imprisonment, at the bottom of his Guidelines range. ECF No. 56; *see* Appellee Br. at 4, 7, No. 08-10957 (11th Cir. June 23, 2008). There, too, at trial, the government presented evidence that the defendant had failed to heave-to on a prior occasion. Appellee Br. at 27–33.

These and other failure-to-heave cases resulted in custodial sentences less than or comparable to that which Avto has already served, even where the facts demonstrated reckless and

---

[16] Moreover, the defendant in *Frometa-Cabrera* was suspected of engaging in alien smuggling and undoubtedly headed to the United States, given the location of capture near Puerto Rico. Unlike there, Avto and *Bella 1* were far from the United States and had no intent to approach it; Avto had no intent to and did not engage in any underlying substantive criminal acts other than the failure to heave-to.

29

obstructive conduct that posed safety and other risks. *See, e.g.*, *United States v. Carrasquillo-Flores*, 22 Cr. 305 (D.P.R.) (Delgado-Hernandez, J.), ECF No. 54 at 12–13; *id.* Nos. 12, 74–75 (captain who failed to heave to did not receive Chapter 3 enhancements, had a Guidelines range of 0–6 months, and received a sentence of time served, amounting to five days in custody, even where he "yelled in Spanish that he was not going to stop," "perform[ed] evasive maneuvers and circles," and fled from the Coast Guard at 20–25 knots by sea and later on foot after "beaching the vessel"); *United States v. Lantigua-Vazquez*, 23 Cr. 4 (D.P.R.) (Carreno-Coll, J.), ECF No. 77 at 11–14; *see id.* Nos. 7, 89–90 (defendant received a time-served sentence of four months, even where, upon the Coast Guard's order, he "immediately began to increase speed," "make large erratic turns while continuing to jettison packages overboard," and where the Coast Guard was required to fire disabling shots until the vessel sank); *United States v. Rijo-Cedano*, 16 Cr. 481 (D.P.R.) (Delgado-Colón, C.J.), ECF No. 60 at 9–10; *id.* Nos. 8, 101–02 (where captain, with Criminal History Category II, was sentenced to the middle of his 4–10-month Guidelines range, or 6.5 months, after "operating the vessel at a high rate of speed away" from the Coast Guard even after warning shots, and fellow crew member "deployed . . . thick fishing lines . . . in an attempt to foul the engines of the Coast Guard" cutter).

As reflected based on a comparison to these cases, a sentence other than time served for Avto would result in an unwarranted sentencing disparity with similarly situated failure-to-heave defendants.

Finally, Avto is the only individual aboard *Bella 1* who has been or is likely to be charged by the United States. Yet the Statement of Offense makes plain that the operator of *Bella 1* and its cargo security manager are more culpable than Avto. *See* Statement of Offense ¶¶ 1–2, 7. The operator was the decision-maker whose directive Avto (regrettably) followed, and the cargo security

30

manager served as his agent aboard the vessel.  Neither reside in the United States, however, and there is no reason to believe that they or any other individual will ever face criminal charges in the United States for this offense, let alone suffer any punishment for their conduct.  As a result, it is likely that Avto is the only person involved in this offense who will be prosecuted, convicted, and punished.

For all these reasons, a time-served sentence is appropriate to avoid any unwarranted sentencing disparities.

### IV.     The Court Should Not Impose Supervised Release or a Fine

Supervised release is not required by statute.  Under the 2025 Guidelines, it should be imposed only if warranted by an individualized need for supervision and "ordinarily should not" be imposed on a deportable defendant who likely will be removed.  U.S.S.G. § 5D1.1(b)–(c).  No such need exists here: Avto has no criminal history, no substance-abuse history, and no identified rehabilitative need; he will reside in Georgia; and the commentary explains that an unlawful return ordinarily is adequately addressed through a new prosecution.  *Id.* cmt. nn.1, 9.  The Court should therefore decline the Probation Office's recommendation of three years' supervised release.

The Court likewise should impose no fine.  The Probation Office ultimately recommends none, recognizing both the practical difficulty of collection after removal and the family's limited liquid resources.  Sentencing Recommendation at 2; *see* PSR ¶¶ 64–68.  Requiring Avto to liquidate property that helps secure his family's future would compound the hardship already caused by his detention and likely loss of employment without materially advancing any sentencing purpose.

## **CONCLUSION**

Avto accepts full responsibility for his misconduct and offers no excuse.  When fashioning a sentence, the Court should assess the whole record to determine an appropriate punishment that is sufficient, but not greater than necessary, to serve the purposes of sentencing.  Here, Avto has served nearly seven months under difficult and unusual conditions; has suffered lasting reputational harm; faces the likely loss of the only career he has known; faces the possibility of immigration detention; and remains separated from the family members who depend on him.  The 47 years of life that preceded this offense—marked by hard work, service, compassion, and integrity—and the acceptance of responsibility that followed it, demonstrate that additional custody is not warranted and would not make the sentence more just.  It would only prolong punishment that is already sufficient to serve every legitimate purpose.

For all the reasons set forth above, a sentence of time served is sufficient, but not greater than necessary, to satisfy the purposes of sentencing.

Dated:  July 27, 2026
      New York, NY

LANKLER SIFFERT & WOHL LLP

By:  *Michael Longyear*
      Jillian B. Berman
      Michael D. Longyear

      1185 Avenue of the Americas
      New York, NY 10036
      (212) 921-8399

      *Attorneys for Defendant*
      *Avtandil Kalandadze*
