**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | |
| **v.** | : | **1:26-cr-24** |
| | : | |
| **AVTANDIL KALANDADZE** | : | **Judge Howell** |
| | : | |
| **Defendant.** | : | |

### GOVERNMENT'S SENTENCING MEMORANDUM

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this memorandum in aid of sentencing. For the reasons stated below, the government recommends that the Court impose a sentence of 14 months' imprisonment. The Government further recommends no term of supervised release, as the defendant is subject to deportation upon completion of his term of imprisonment.

The recommended sentence reflects the seriousness of the offense, the defendant's sustained and deliberate conduct in evading orders from the United States Coast Guard, his use of specialized maritime skills to facilitate the offense, his decision to destroy records, and the substantial risk of death or serious injury his actions created for U.S. personnel operating in heavy seas. It also accounts for the defendant's acceptance of responsibility, lack of criminal history, and his status as a zero-point offender.

### I. FACTUAL BACKGROUND

The defendant, Avtandil Kalandadze, served as the Master of the Motor Tanker *Bella I* and played a central role in a sustained effort to evade lawful orders from the United States Coast Guard (USCG) over a period of weeks. While unladen at the time of the boarding and the defendant's arrest, the *Bella I* previously transported approximately 1.8 million barrels of Iranian

oil while he was serving as Master. His conduct was deliberate, repeated, and dangerous, and cannot be characterized as a momentary lapse in judgment.

Beginning on or about September 1, 2025, and continuing through late-December 2025, the defendant served as the Master of *Bella I*. In that role, he was responsible for the navigation, operation, and safety of the very large crude-oil carrier/tanker and its crew. He was paid approximately $14,000 per month as Master. PSR ¶¶ 9–10, 63.

During that time, the *Bella I* transported roughly 1.8 million barrels of Iranian oil, and the defendant, acting at the direction of the vessel's Operator, undertook multiple steps to conceal the illicit nature and origin of the cargo. These actions included deactivating the vessel's Automatic Identification System ("AIS") during a voyage from Iran to Asia, which creates significant risks for maritime safety. PSR ¶ 10. At the Operator's direction, the defendant further instructed crew members to physically conceal the vessel's name during ship-to-ship transfers of Iranian oil, another common method used to obscure the origin of illicit cargo. Id.

Following the discharge of the Iranian oil cargo, the *Bella I* sailed to the Caribbean, where the U.S. Coast Guard (USCG) attempted to intercept it. Although the vessel was flying a Guyanese flag, U.S. authorities contacted the government of Guyana and discovered the ship's registration was fraudulent. Because it was flying a false flag, the *Bella I* was a stateless vessel. As a stateless vessel, U.S. authorities could lawfully board the ship under both domestic and international law.[1]

---

[1] Under the United Nations Convention on the Law of the Sea (UNCLOS), a warship or law enforcement vessel has the right to board a foreign ship on the high seas if there are reasonable grounds to suspect the ship is without nationality (stateless). UNCLOS Article 110. A ship that sails under the flags of two or more states, using them according to convenience, or a ship using a fraudulent registration, may not claim any of those nationalities and is assimilated to a ship without nationality. UNCLOS Article 92.  14 U.S.C. § 522 gives the USCG authority to "make inquiries, examinations, inspections, searches, seizures, and arrests upon the high seas and waters over which the United States has jurisdiction, for the prevention, detection, and suppression of violations of laws of the United States." A vessel is subject to the jurisdiction of the United States if it is without nationality, which includes "a vessel aboard which the master or individual in charge makes a claim of registry that is denied by the nation whose

Despite receiving multiple lawful commands from the USCG to stop and assist boarding efforts (heave to), the vessel, acting under the Defendant's direct orders, refused to comply. PSR ¶¶ 11–12. The failure to heave to began on December 20, 2025, and continued through January 7, 2026, during which period of time the defendant repeatedly failed to obey lawful orders by authorized federal law-enforcement officers to heave to the USCG Cutter *Munro*. PSR ¶¶ 11–12. As Master of the vessel, the defendant had the authority, as well as the responsibility, to comply with USCG orders, and yet he continuously chose not to. His failure to heave to continued even after he ceased serving formally as Master, as he remained involved in piloting and operating the vessel. Id.

On December 21, 2025, the defendant compounded his unlawful conduct by destroying records and information aboard *Bella I* at the Operator's direction. PSR ¶ 13. Given the recent cargo of Iranian oil and subsequent ship-to-ship transfer, the records he destroyed likely related to violations of U.S. sanctions.

Throughout this period, the defendant used his specialized maritime training and professional experience, which includes over two decades of service on oil tankers and a Master's degree in navigation, to facilitate and conceal criminal activity. PSR ¶¶ 14, 58–61. His use of this specialized skill was essential to enabling the vessel's continued evasion of USCG authority.

The defendant's refusal to comply with USCG orders created exceptionally dangerous conditions. According to the PSR, the failure to heave to created a substantial risk of death or serious bodily injury to U.S. military and law-enforcement personnel who ultimately boarded *Bella I* in heavy seas and poor weather in the North Atlantic. PSR ¶ 15. Regardless of whether this situation is one he intended to create, boarding a large tanker under such conditions is inherently

---

registry is claimed."   46 U.S.C. § 70502(c)(1)(A) & (d)(1)(A).

hazardous, and the defendant's choices materially increased the danger both to USCG members and to the vessel's crew.

## II. GUIDELINES CALCULATION

As set forth in the PSR and consistent with the parties' Rule 11(c)(1)(B) agreement, the defendant's advisory Guidelines range captures the seriousness of his sustained refusal to obey orders from the USCG, combined with his use of specialized maritime skills, his destruction of records aboard the vessel, and the dangerous circumstances created during flight.

Under U.S.S.G. § 2A2.4(a), the offense of failing to heave to carries a base offense level of 10. PSR ¶ 23. The defendant's conduct then warrants several enhancements. First, because he used the specialized skills and training required of a Master mariner to facilitate the offense, a two-level enhancement applies under § 3B1.3. PSR ¶ 26.

Second, the defendant received a two-level enhancement under § 3C1.1 for obstructing justice by destroying records onboard the *Bella I* at the Operator's direction. PSR ¶ 27.

Third, the defendant's repeated failure to comply with USCG orders forced U.S. personnel to board a large crude-oil tanker in heavy seas and poor weather in the North Atlantic, creating a substantial risk of death or serious bodily injury. Accordingly, a two-level enhancement for reckless endangerment during flight applies under § 3C1.2. PSR ¶ 28.

These enhancements result in an adjusted offense level of 16. PSR ¶ 29. The defendant received a three-level reduction for acceptance of responsibility under §§ 3E1.1(a) and (b), which reflects his timely decision to plead guilty and his acknowledgment of the conduct described in the Statement of Offense. PSR ¶¶ 31–32. He also qualifies for a further two-level reduction as a zero-point offender under § 4C1.1. PSR ¶ 33.

4

The resulting total offense level is 11. PSR ¶ 34. With a Criminal History Category I, this produces an advisory Guidelines range of 8 to 14 months. PSR ¶ 70. The range falls within Zone B of the Sentencing Table, meaning that various sentencing options are permissible under the Guidelines, including a term of imprisonment. As explained below, a sentence of 14 months appropriately captures both the seriousness of the offense and the relevant sentencing factors under 18 U.S.C. § 3553(a).

**III. SENTENCING FACTORS UNDER 18 U.S.C. § 3553(a)**

The government respectfully submits that a sentence of 14 months is appropriate in light of the sentencing factors set forth in 18 U.S.C. § 3553(a). The defendant's conduct was prolonged, deliberate, and dangerous. He used his specialized maritime skills to navigate a very large crude-oil carrier/tanker while actively evading the USCG, destroyed evidence aboard the vessel, and created circumstances that forced USCG, Department of War, and other federal personnel to undertake a hazardous boarding in heavy seas. This conduct warrants a sentence at the upper end of the Guidelines range.

**A. Nature and Circumstances of the Offense**

The offense here is serious and involves different acts of criminal conduct, demonstrating the defendant's intent and disregard for lawful authority.

Prior to entering the region where U.S. law enforcement ultimately encountered the *Bella I*, the defendant engaged in a series of deliberate measures designed to obfuscate the origin and nature of the cargo the vessel was carrying. As the PSR describes, during the months in which the defendant served as Master, the *Bella I* transported approximately 1.8 million barrels of Iranian oil. PSR ¶¶ 9–10. To conceal this activity, the defendant directed that the vessel's AIS remain

disabled, a tactic frequently used by tankers engaged in illicit maritime smuggling. Id. The defendant also instructed crewmembers to physically conceal the vessel's name during ship-to-ship transfer operations. Id.

After offloading the Iranian oil, the *Bella I* was instructed to sail into the Caribbean region, where it was engaged by the USCG. The USCG determined that the *Bella I* was flying a Guyanese flag, based on a claim by the defendant. After contacting Guyanese authorities, the USCG learned that the *Bella I* was, in fact, not registered in Guyana as it claimed, and was therefore a stateless vessel. Consequently, U.S. authorities had the right under international and U.S. law to board the *Bella I* due to its stateless status. The USCG gave the *Bella I* several lawful orders to heave to, but the Defendant refused to comply. PSR ¶¶ 11–12. The defendant's refusal was not momentary or inadvertent, but rather continued over multiple days, at times when he was both serving formally as Master and later when he continued participating in the piloting and navigation of the vessel.

The defendant compounded his criminal conduct on December 21, 2025, when he destroyed records and information aboard the *Bella I* at the direction of the Operator. PSR ¶ 13. The Defendant's decision to destroy records one day after being engaged by U.S. law enforcement underscore his intent to hinder U.S. authorities and conceal evidence of the vessel's activities and previous cargo.

The Defendant's prolonged refusal to comply forced the USCG, Department of War, and other federal components to undertake a hazardous boarding operation in heavy seas and poor weather in the North Atlantic. PSR ¶ 15. This environment created a substantial risk of death or serious bodily injury to boarding personnel, as well as to the crew of the *Bella I*. Absent his refusal

6

to heave to, U.S. personnel would not have been compelled to attempt such a dangerous boarding.

The Defendant's decisions to navigate a massive tanker in defiance of maritime safety norms, to destroy records after being given the order to heave to, and refusing lawful orders for days reflect a deliberate pattern of evasion and a willingness to endanger others. Taken together, these facts demonstrate that the nature and circumstances of the offense justify a sentence at the top of the Guidelines range.

### B.   History and Characteristics of the Offender

Under 18 U.S.C. § 3553(a)(1), the Court must consider the history and characteristics of the defendant. As the PSR reflects, the defendant has no prior criminal convictions and qualifies as a zero-point offender. PSR ¶¶ 36–37, 33. While the Court should credit the Defendant for his lack of criminal history, it must be weighed against the seriousness of the instant offense and the deliberate nature of his conduct.

The Defendant is a highly trained maritime professional with more than twenty-five years of experience aboard oil and chemical tankers, including multiple contracts serving as Master. PSR ¶¶ 58–63. He holds a Master's degree in navigation, several advanced certifications, and has a long history of overseeing large cargo vessels. These qualifications highlight that his offense was not the product of inexperience, confusion, or inadequate training. He possessed every skill and opportunity necessary to comply with maritime safety norms and lawful USCG commands, yet chose not to.

The Defendant grew up in a stable environment and has strong family support. The PSR reports no childhood abuse, neglect or trauma, he has maintained longstanding employment in a skilled profession, and has a stable marriage and close relationship with his daughter. PSR ¶¶ 41–

50. These advantages emphasize that his criminal conduct was not driven by desperation, addiction, or lack of opportunity.

The government acknowledges the hardships the defendant's incarceration has imposed on his family, including his wife, daughter, and aging parents. PSR ¶¶ 45, 49, 54. Those personal circumstances, however, were well known to the defendant when he chose to destroy records aboard the *Bella I* and evade the USCG for days. Unlike offenders whose crimes stem from personal instability or poverty, the defendant had no such circumstances driving him to criminal conduct.

## C. The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law

A meaningful term of imprisonment is necessary to reflect the seriousness of the defendant's conduct and to promote respect for the law. Congress has made clear that the failure to heave to is a serious crime by making it a felony punishable by at least up to 5 years in prison, and perhaps greater depending on the circumstances. As previously stated, the Defendant's refusal to obey lawful orders was sustained over multiple days and undertaken with full knowledge of the risks involved, which were further compounded by his decision to obstruct justice by destroying records. And while it may not have been his intention, his decisions imperiled the lives of scores of other people when U.S. authorities were forced to board his vessel in unfavorable conditions. Safe maritime enforcement operations depend on cooperation from vessel masters, and when mariners refuse to cooperate, as here, the danger increases dramatically.

A custodial sentence is also necessary to promote respect for the law. A lenient sentence would risk signaling that evasion, evidence destruction, and dangerous navigation carry minimal

8

consequences. The defendant's actions required the deployment of significant U.S. resources and placed federal personnel in harm's way. Failing to impose meaningful punishment would diminish the deterrent effect of USCG authority and weaken the consequences supporting maritime safety and interdiction, making future such encounters less safe for all involved.

**D. The Need to Avoid Unwarranted Sentencing Disparities**

A sentence of 14 months is also necessary to avoid unwarranted sentencing disparities among similarly situated defendants. Section 3553(a)(6) directs the Court to consider the need for consistency in sentencing, particularly in cases where defendants engage in comparable conduct and present similar levels of culpability.

The Guidelines range is 8 to 14 months, and the Probation Office recommends a custodial sentence of one year and one day. According to Judiciary Sentencing Information (JSIN), defendants sentenced under § 2A2.4 with a final offense level of 11 and a Criminal History Category I receive an average sentence of 8 months. PSR ¶ 96. Here, Defendant's actions risked the lives of dozens of other people and destroyed important records related to the activities of the *Bella I* and the Iranian oil sector (which supports Iran's government, military, and the Islamic Revolutionary Guard Corps, a Foreign Terrorist Organization), and such reckless and dangerous conduct warrants a sentence in excess of the average. A lower sentence would risk unwarranted disparity with defendants whose conduct was similar or less severe, but who nonetheless received sentences similar to the Defendant's. A sentence at the top of the guideline range makes it clear that this Defendant's actions went beyond only failing to heave to.

In *United States v. Williams*, 865 F.3d 1328 (11th Cir. 2017), the defendant was convicted after trial of failing to heave to under 18 U.S.C. § 2237(a)(1) and received a five-year sentence,

imposed concurrently with significant drug-trafficking convictions. The conduct in *Williams* involved dangerous evasive maneuvers in six- to eight-foot seas, discarding cargo, and repeatedly ignoring commands issued in English and Spanish before finally stopping only when the Coast Guard's vessel approached within a few feet.

Here, the defendant's conduct similarly involved sustained refusal to obey Coast Guard orders, destruction of evidence immediately before boarding, and navigation of a large tanker under conditions that created significant risks to the Coast Guard and Department of Defense personnel responding in heavy seas. A sentence of fourteen months—approximately ¼ of the sentence in *Williams*—appropriately accounts for the seriousness of the defendant's conduct while avoiding unwarranted disparity with sentences imposed in cases involving comparable or more aggravated maritime evasion.

A comparison to *United States v. Chinnery*, No. 23-2275, 2024 U.S. App. LEXIS 13607 (3d Cir. June 5, 2024), also supports the government's recommendation. There, the defendant engaged in dangerous nighttime evasion between the British Virgin Islands and the United States Virgin Islands while likely attempting to smuggle people into the United States, accelerating his vessel, ignoring repeated Coast Guard signals and commands, and continuing his flight even after warning flares were fired, stopping only after law enforcement disabled his engine with copper slugs. Chinnery was sentenced to eight months' imprisonment, with no supervised release.

While the conduct in *Chinnery* was serious, it involved a small vessel, a relatively short period of evasion, and no destruction of evidence. By contrast, the defendant here navigated a very large crude-oil carrier/tanker, refused Coast Guard orders for days, and destroyed records aboard the vessel immediately before boarding, and created dangerous conditions for U.S. personnel.

10

Similarly, in *United States v. Santana-Perez*, 619 F.3d 117 (1st Cir. 2010), the defendant refused repeated Coast Guard commands to stop over a *twelve-minute* period, requiring multiple approaches by a boarding team before finally halting when warned that force would be used. Santana-Perez was sentenced to twelve months' imprisonment, followed by three years of supervised release. While Santana-Perez's conduct also involved the attempted destruction of evidence by jettisoning duffel bags of drugs, the flight was brief, involved a small vessel and did not imperil law enforcement and other U.S. personnel to the same extent as the Defendant's actions.

Together, these cases confirm that courts consistently impose meaningful custodial sentences for violations of § 2237(a)(1), and that sentences in the range of the Government's request here are well within the national norm for defendants who engage in dangerous maritime evasion. A sentence of 14 months accounts for sentences imposed in comparable failure-to-heave-to prosecutions, accounts for the particular aggravating factors present here, and avoids unwarranted disparities with other defendants.

## IV. CONCLUSION

For the foregoing reasons, the Government respectfully requests that the Court impose a sentence of 14 months' imprisonment and no term of supervised release. Such a sentence will appropriately reflect the seriousness of the offense, the defendant's acceptance of responsibility, and the need to deter others while avoiding unwarranted disparities.

JEANINE FERRIS PIRRO
UNITED STATES ATTORNEY

By:

   */s/  Christopher Tortorice*

11

Christopher Tortorice
Assistant United States Attorney
Texas Bar No. 24048912
National Security Section
601 D Street, N.W.,
Washington, D.C. 20530
(202) 252-7155
christopher.tortorice@usdoj.gov

  /s/    *Sean R. Heiden*
Sean R. Heiden
Trial Attorney
D.C. Bar No. 1617636
U.S. Department of Justice
National Security Division
950 Pennsylvania Avenue, NW
Washington, D.C. 20530
(202) 514-8106
sean.heiden2@usdoj.gov